Filed 4/24/25  In re M.D. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

---

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

---

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re M.D. et al., Persons Coming Under the Juvenile Court Law. | C101144 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, | (Super. Ct. Nos. JD242711, JD242712) |
| Plaintiff and Respondent, | |
| v. | |
| J.D., | |
| Defendant and Appellant. | |

Appellant J.D., mother of minors Ma.D. and Mi.D., appeals jurisdictional and dispositional orders adjudging minors dependents of the juvenile court under Welfare and Institutions Code section 300, subdivisions (a), (b), and (j).[1]  Her sole contention on

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

appeal is that insufficient evidence supports the juvenile court's jurisdictional findings. We conclude there is substantial evidence to support the findings and therefore affirm.

BACKGROUND

On October 25, 2023, the Sacramento County Department of Child, Family, and Adult Services (Department) filed dependency petitions alleging that Ma.D. (then five weeks old) and Mi.D. (then four years old): (1) had suffered, or were at substantial risk of suffering, serious physical harm inflicted nonaccidentally by a parent or guardian (§ 300, subd. (a)); (2) had suffered, or were at substantial risk of suffering, serious physical harm as a result of the failure or inability of a parent or guardian to supervise or protect them (§ 300, subd. (b)(1)); and (3) were at substantial risk of being abused or neglected because their sibling had been abused or neglected (§ 300, subd. (j)). The petitions alleged that on October 22, 2023, a child abuse specialist examined Ma.D. at a medical center and found injuries that included bilateral subdural hematomas, retinal hemorrhaging, intravenous bleeding inside of the ventricles, sub arachnoid hemorrhaging, and ongoing seizures. The specialist reported that "retinal hemorrhaging in a five-week-old baby is most specifically associated with abusive head trauma or shaking." The petitions alleged that parents did not have a "trauma story" that was consistent with Ma.D.'s injuries. The petitions further alleged as to section 300, subdivision (a) that Ma.D.'s injuries "are consistent with non-accidental trauma and such a condition would not ordinarily occur except as a result of unreasonable or neglectful acts or omissions on the part of the child's mother or the father." The juvenile court issued a protective custody warrant as to Ma.D. but denied the Department's application for a protective custody warrant as to Mi.D.

According to the Department's detention report, mother brought Ma.D. to the hospital on October 21, 2023 due to concerns that the baby was having " 'odd movements.' " A computed tomography scan "showed retinal and bilateral hematomas, with bleeding between the brain and skull as well as in the pupil area." The social worker

interviewed mother at the hospital in the presence of a police officer. Mother reported that she usually watches Ma.D. during the day and father watches the baby at night. On the morning of October 21, father took the baby to mother as part of their usual trade off. While mother was trying to breastfeed Ma.D., she noticed the baby began twitching and jittering, so she brought the baby to the emergency room. Mother denied any past trauma and reported that the only potential incident she could think of was when a large magnet fell off the refrigerator and hit Ma.D. on the head on October 20, 2023.

The social worker separately interviewed father at the hospital in the presence of a police officer. Father also denied any trauma history. He stated that, prior to trading off care with mother on the morning of October 21, he did not notice the baby twitching or acting differently.

The social worker spoke with maternal grandmother over the phone. She reported that the only traumatic events were Ma.D.'s difficult birth and the magnet falling on her head. Maternal grandmother stated that mother was grilling father about falling asleep or dropping the baby, but father kept denying that had occurred.

The social worker spoke with the medical center's child abuse specialist, Dr. Julia Magana, on October 23, 2023. The detention report summarized this conversation as follows: "Dr. Magana reported this is a highly concerning situation. Dr. Magana reported the totality of injuries are bilateral subdural hematomas and in that same area there are changes on the MRI that can indicate ischemia[,] which is often seen when there is shaking of a baby. Dr. Magana reported there are some areas on the MRI that show a lack of oxygen so that suggests that there was some injury to the cells in that area. Dr. Magana reported that type of injury is typically seen with shaking and/or abusive head trauma stating it is in a very specific location. Dr. Magana reported these injuries can also be seen with other things as well[;] however, the baby does not have those other things such as high blood pressure, drowning episodes, or blunt trauma. Dr. Magana reported the subdural hematomas are most commonly caused by blunt trauma, but they

3

can be caused by other things[;] but due to there being no trauma story[,] that cannot be ruled out. Dr. Magana reported due to there being a lack of trauma history, and putting all the pieces together related to the subdural and retina hemorrhaging there are suspicions of abuse. Dr. Magana reported retinal hemorrhaging in a five-week-old baby is most specifically associated with abusive head trauma or shaking. Dr. Magana reported the retinal hemorrhaging occurs when the head is moving back and forth causing a whip lash that stretches, tears, and releases blood under the retina. Dr. Magana reported the retinal hemorrhaging can also be caused by things like severe sepsis or heart disease, and accidental trauma[;] however, the baby does not have those conditions and she has not heard a trauma story related [to] accidental trauma. Additionally, Dr. Magana stated she found several different parts of the brain that were bleeding. Dr. Magana reported there was intravenous blood found inside of the ventricles as well as a sub arachnoid hemorrhage[,] stating that's on the top of the head. Dr. Magana reported the bleeding is not massive enough she has to operate, but there's a lot of blood in different areas and bleeding in different areas of the brain[,] which typically means something globally happened to the whole brain. Dr. Magana reported birth can be a possibility for the bleeding[;] however, the baby is too far out from birth for that to be a factor. Dr. Magana reported they are confident this is new blood, stating old blood would maybe be from birth but that also would not explain the seizures to be present at this time. Dr. Magana reported they always take the approach to see how the injuries could have occurred and attempt to find a medical cause. Dr. Magana reported the mother's story regarding the magnet hitting the child could not have caused the injuries she is presenting with. . . . Dr. Magana reported the baby could potentially have a bleeding disorder; however, it does not explain the brain bleeding in several different areas across the head. Dr. Magana reported the ventricles don't just explode across the head. Additionally, Dr. Magana reported she ruled out the possibility of the baby having a metabolic disorder and even if the baby did have a metabolic disorder, it does not explain everything that is

4

going on. Dr. Magana reported this is highly concerning and she is trying to find something else that could have caused this; however, they are far enough into this stating they are way over 51% sure this is abusive head trauma."

A pediatrician performed a wellness exam on Mi.D. and concluded there were no concerns.

The social worker spoke again with Dr. Magana on October 26, 2023. Dr. Magana reported that Ma.D. continued to have intermittent seizures and remained in the intensive care unit. Dr. Magana further reported that they had completed a skeletal survey of Ma.D. and found at least one fracture and possibly two others. The fracture Dr. Magana was certain about was a distal tibial fracture in the shin. She reported that "this type of injury is typically seen with pulling, twisting, or shaking." She stated that this type of injury can be seen at birth but would require the child being pulled out by the foot at birth and that was not the cause in this case. Although she could not provide a precise date of the injury, she reported that the timing of the injury was not consistent with birth being the cause. She noted that it was possible the injury occurred on October 21, 2023, but it would be unusual for the injury to have been that recent based on the status of the bone healing. Dr. Magana stated this case is very concerning for child abuse due to this having to be "an inflicted injury."

The juvenile court ordered both Ma.D. and Mi.D. detained at the October 27, 2023 detention hearing. Both children were ultimately placed with the maternal grandmother with regular visitation with parents.

According to the jurisdiction and disposition report, the social worker again separately interviewed mother and father. Both parents denied the abuse allegations and maintained that they did not know how Ma.D. had sustained her injuries. Mother stated that she was not present when the injuries were sustained and that she called the emergency room right away after father brought the baby to her. Father stated that Ma.D. was never left alone with Mi.D. or the family's dogs. Dr. Magana reported that there

5

would be ongoing genetic testing performed on Ma.D. to rule out the possibility of Menkes Disease due to a copper deficiency; but Dr. Magana maintained that the injuries were more likely from head trauma abuse.

The first addendum to the jurisdiction and disposition report described other medical assessments. Dr. Magana stated that there was no stroke or vascular injury that would explain Ma.D.'s injuries and that the cause was not meningitis or encephalitis. On October 22, 2023, a consulting ophthalmologist reported that the numerous retinal hemorrhages were highly suggestive of abusive head trauma. An orthopedic surgeon recommended continued evaluation due to concerning findings of nonaccidental trauma. An X-ray report indicated healing fractures in the shoulder and lower shin/ankle. On December 5, 2023, Dr. Magana reported that testing confirmed that Ma.D. did not have Menkes Disease. On December 15, 2023, the social worker inquired of Dr. Magana whether a medical condition called "PRES" could have caused Ma.D.'s injuries. Dr. Magana stated that Ma.D. did not have high blood pressure and even if she did have PRES, it would not cause all the injuries Ma.D. had sustained. Copies of Ma.D.'s medical records were included with the addendum report.

The second addendum to the jurisdiction and disposition report stated that mother had requested a specialist in Menkes Disease to review the case. That specialist ultimately opined that Ma.D. did not have Menkes Disease.

The combined jurisdiction and disposition hearing took place on April 26, 2024. Mother and father waived the right to a contested hearing, objected to the juvenile court assuming jurisdiction over minors, and submitted the matter on the Department's reports.

The juvenile court found the allegations in the Department's petitions true by a preponderance of the evidence. It further found that Ma.D.'s injuries were "of a nature as would ordinarily not be sustained, except as the result of the unreasonable or neglectful acts or omissions of the parents . . . who have the care or custody of the children."

Mother timely appealed.

6

On appeal, mother contends that the juvenile court's jurisdictional findings are not supported by substantial evidence and that there was no evidence of current risk to minors at the time of the jurisdiction hearing.

As a preliminary matter, mother represents that, during the pendency of this appeal, the juvenile court terminated dependency jurisdiction. She maintains that her appeal is nevertheless not moot because the Department's sustained finding of abuse has resulted in her inclusion in the California Department of Justice's Child Abuse Central Index (CACI).[2] The Department does not dispute that mother's appeal presents a live controversy.

We agree that the present appeal is not moot because inclusion in CACI carries distinct practical and legal consequences. (See *In re D.P.* (2023) 14 Cal.5th 266, 278-279 [discussing effects of listing in CACI].) Unlike in *D.P.*, where there was no evidence that the appealing parent had been or was likely to be listed in CACI (*id.* at pp. 280-282), here the record indicates, and the Department does not dispute, that the Department has already reported mother for inclusion in the index. Thus, unlike in *D.P.*, the effects of the juvenile court's jurisdictional findings in this case are not "too speculative to demonstrate a specific legal consequence that a favorable judgment could redress." (*Id.* at p. 282.)

Turning to the merits, in a dependency proceeding, a child welfare agency must prove by a preponderance of the evidence that the minor who is the subject of a dependency petition comes within the juvenile court's jurisdiction. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773.) As relevant here, section 300, subdivision (a)

---

[2] Mother requests that we take judicial notice of the written notice she received from the California Department of Social Services informing her that the Department's "finding of substantiated abuse or severe neglect was sent to the California Department of Justice (DOJ) for inclusion in the Child Abuse Central Index (CACI)." We grant mother's request. (Evid. Code, §§ 452, subd. (c), 459.)

authorizes dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Section 300, subdivision (b)(1)(A) provides for jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child." And section 300, subdivision (j) allows a juvenile court to assume jurisdiction when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

We review a juvenile court's jurisdictional finding for substantial evidence, asking whether the record contains evidence that is reasonable, credible, and of solid value sufficient for a reasonable trier of fact to find jurisdiction. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) We consider the record as a whole, resolving all conflicts and drawing all reasonable inferences in support of the juvenile court's findings. (*Ibid.*) We do not reweigh the evidence. (*Ibid.*) If supported by substantial evidence, the finding must be upheld even though substantial evidence could also support a contrary judgment. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

Both parties discuss the extent to which the presumption set forth in section 355.1 is implicated by this case. Section 355.1, subdivision (a) establishes a rebuttable presumption affecting the production of evidence. (See § 355.1, subd. (c).) Under that provision, "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a).) "Once the petitioner

8

establishes a prima facie case under section 355.1 the burden of producing evidence 'shifts to the parents the obligation of raising an issue *as to the actual cause of the injury* or the fitness of the home.' [Citation.] 'The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' " (*In re D.P.* (2014) 225 Cal.App.4th 898, 903-904.)

Mother argues that the presumption did not apply in this case because no medical professional expressly opined that Ma.D.'s injuries were "of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent." (§ 355.1, subd. (a).) We disagree because section 355.1, subdivision (a) does not require that a professional render an opinion precisely mirroring the statutory language. Rather, the presumption applies if "*the court* finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent." (*Ibid.*, italics added.) Here, the juvenile court made such a finding, and that finding is supported by the competent professional evidence before the juvenile court. We also disagree with mother's assertion that she rebutted the presumption based on evidence that parents "were highly protective" and that no concerns about violence, abuse, neglect, or anger management had surfaced during the four years they cared for Ma.D.'s older sister, Mi.D. This evidence did not raise "an issue *as to the actual cause of the injury*." (*In re D.P.*, *supra*, 225 Cal.App.4th at p. 903.) Nor did medical providers' references to possible accidental causes of the injuries. Those references reflect that providers considered accidental trauma as well as potential medical causes for the harm but ruled out those possibilities as the source of Ma.D.'s injuries.

9

All that said, it is unclear whether the juvenile court actually relied on the presumption in this case. While the presumption was alleged in the Department's petitions and the court made the necessary finding as to the presumption, the court did not otherwise discuss the presumption or express a view as to whether the presumption had been rebutted. Given this, we will proceed to consider whether substantial evidence supports the court's jurisdictional findings. We conclude that it does.

Starting with the section 300, subdivision (a) finding, Dr. Magana opined that, based on the nature and extent of Ma.D.'s injuries, the care team was "way over 51% sure this is abusive head trauma." Dr. Magana considered numerous potential causes for the injuries—including bleeding disorders, metabolic disorders, certain genetic conditions, infection, injuries sustained during birth, and accidental trauma—and effectively ruled them out. Dr. Magana also concluded that Ma.D.'s bone fracture in her shin had been inflicted, and the consulting ophthalmologist reported that Ma.D.'s eye injuries were "highly suggestive of abusive head trauma." This evidence supports the conclusion that Ma.D. suffered serious physical harm inflicted nonaccidentally.

Mother contends that there was insufficient evidence that the harm was specifically inflicted by a parent. Initially, she asserts that the juvenile court failed to make a finding that the harm was inflicted by a parent as required under section 300, subdivision (a). This is incorrect, because the juvenile court's written order following the hearing found, by a preponderance of the evidence, that "the allegations set forth in the Petition as originally filed or as amended are true." And both petitions alleged that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted non-accidentally upon the child *by the child's parent or guardian*." (Italics added.)

The record also supports the finding that the harm was inflicted by a parent. Ma.D. was in parents' custody immediately before she was brought to the hospital with the injuries and was reportedly never left alone with her older sister or the family's dogs.

A reasonable inference from this evidence is that the nonaccidental harm was inflicted by a parent. Mother points to other evidence in the record showing that she and father were highly protective parents who responded diligently and appropriately to Ma.D.'s injuries; had no prior history of violence, anger management issues, abuse, or neglect; and performed well with their case plan. Given the deferential standard of review, however, we are not free to adopt alternate inferences that could be drawn from the evidence. (See *People v. Myles* (2023) 89 Cal.App.5th 711, 740 ["for purposes of substantial evidence review, we are not permitted to draw inferences contrary" to the judgment]; *People v. Kraft* (2000) 23 Cal.4th 978, 1054 [" ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal" ' "].)

Mother also argues that Dr. Magana's opinion that the injuries were likely the result of nonaccidental trauma was based on mere speculation stemming from parents' failure to provide an alternate explanation as to the cause. We disagree that the failure to provide a plausible explanation for Ma.D.'s injuries was an improper consideration. Part of Dr. Magana's assessment was to evaluate whether Ma.D.'s injuries were consistent with a given source of trauma. For instance, Dr. Magana considered whether the injuries could be explained by minor's difficult birth or the magnet that fell on her head. Dr. Magana concluded they could not. The lack of an alternate explanation for Ma.D.'s injuries was relevant to the exclusion of accidental trauma as a possible cause of injury and the ultimate conclusion that the trauma must have been nonaccidental.

On this same point, mother contends that the record contains no evidence that minor's injuries could not have occurred during "regular activities" involved in the normal care of a newborn. But as we have explained, the record contains significant evidence that Ma.D.'s injuries were not the result of normal care but rather from nonaccidental abusive head trauma. The record need not affirmatively and conclusively eliminate any possibility of a contrary conclusion. The juvenile court need only find that

11

the allegations set forth in a petition are true by a preponderance of the evidence (§ 355, subd. (a)), and that finding will be sustained on appeal if supported by substantial evidence.

Mother's challenge to the juvenile court's finding under section 300, subdivision (b) mirrors arguments she makes in connection with jurisdiction under subdivision (a). She asserts that no medical professional in this case opined that Ma.D.'s injuries could not have been sustained accidentally; accidental injury is not the same as neglect; and the evidence was too weak to support the court's finding in light of the evidence of the adequacy of parents' caregiving. For the reasons stated above, we reject these arguments.

Mother's sole argument as to the section 300, subdivision (j) finding is that, because Ma.D. had not been abused or neglected under section 300, subdivisions (a) and (b), there was no basis for finding jurisdiction over Mi.D. under section 300, subdivision (j). Having rejected mother's challenges to jurisdiction under section 300, subdivisions (a) and (b), we likewise reject her challenge as to the subdivision (j) finding.

As to Mi.D., mother raises the additional point that there was no evidence of actual abuse as to Mi.D. and that Mi.D., who was four years old, was not at risk of the same type of injuries as those to a newborn baby. But given the nature and extent of injuries sustained by Ma.D., there was sufficient evidence that Mi.D. was also at substantial risk of abuse or neglect. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 773 ["section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected"]; *id.* at p. 774 [" 'The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise

12

jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance' "]; *In re D.B.* (2018) 26 Cal.App.5th 320, 330, fn. 5 [concluding that finding of substantial risk under section 300, subdivision (j) based on parents' physical abuse of sibling "also supports jurisdiction under section 300, subdivision (a)"].)

Mother also argues that the jurisdictional findings were unsupported because six months had passed since Ma.D.'s injuries and there was no ongoing risk to minors by the time of the jurisdiction hearing. We reject this argument. As an initial matter, the fact that no further injuries were inflicted by either parent during this time is of little relevance given that minors were not living with their parents for most of the six-month period. In addition, as to Ma.D., the Department's allegations under section 300, subdivisions (a) and (b) only required a showing of past harm. (§ 300, subds. (a) & (b)(1) [jurisdiction proper where a child "has suffered" serious harm]; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1439.) To the extent that evidence of a future risk of injury was required (§ 300, subd. (j); *In re T.V.* (2013) 217 Cal.App.4th 126, 133), the record contains such evidence. Ma.D. sustained very serious injuries—including multiple bone fractures, brain bleeds, and retinal bleeding that required hospitalization. The passage of six months without further incident does not negate a finding that minors were at substantial risk at the time of the hearing. (See *T.V.*, at p. 133 [court may "consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior"].) Parents' continued denials were also relevant to a determination of future risk to the children under section 300. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1125 ["in evaluating current risk, court should consider evidence of parent's current understanding of and attitude toward the past conduct that endangered a child"]; *In re L.O.* (2021) 67 Cal.App.5th 227, 240; *In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[D]enial is a factor

often relevant to determining whether persons are likely to modify their behavior in the future without court supervision' "].)

## DISPOSITION

The jurisdictional and dispositional orders of the juvenile court are affirmed.

/s/
FEINBERG, J.

We concur:

/s/
EARL, P. J.

/s/
BOULWARE EURIE, J.